# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 12, 2007

Charles R. Fulbruge III
Clerk

No. 06-10686

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

TAM NGUYEN; MYNA TRAN

Defendants-Appellants

Appeals from the United States District Court for the
Northern District of Texas, Dallas

Before JOLLY, STEWART, and PRADO, Circuit Judges.

PRADO, Circuit Judge:

Defendants-Appellants Myna Tran ("Myna") and Tam Nguyen ("Tam") appeal from final judgments of conviction for their involvement in a fraudulent home buying scheme.[1]    Myna challenges her convictions on three grounds, claiming that (1) the government presented insufficient evidence to support her convictions, (2) the district court erred in admitting summary witness testimony, and (3) the district court erred in admitting evidence of unindicted transactions and in issuing conflicting limiting instructions.  Tam challenges his convictions

---

[1] We will refer to many individuals by their first names because numerous defendants and witnesses in this case have identical last names.

on the ground that his trial counsel provided ineffective assistance, which resulted in prejudice to him. For the reasons that follow, we AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2002, Sean Nguyen ("Sean"), a mortgage broker for Century Mortgage, and Dai Quoc Nguyen ("Dai"), a sales representative for Re/Max, devised a scheme to take advantage of a loan program that mortgage lender Countrywide Home Loans ("Countrywide") offered to its customers.[2] The loan program allowed customers to secure a "no income, no asset" verification loan, or "NINA" loan, in which a home loan applicant who had an outstanding credit rating and who planned to live in a purchased home could obtain a loan without documentation of his or her income or assets.

The government alleges that the scheme worked as follows: The defendants and co-conspirators would locate a single family residence offered for sale in metropolitan Dallas, Texas. Sean would have an appraiser, Ghandi Morka ("Morka"), prepare an appraisal for the home which would overstate its true value by $100,000 to $200,000. Other participants in the scheme would recruit a "straw buyer" with good credit to act as the buyer of the property, even though this person did not intend to live in the house or pay back the loan. One of two mortgage companies, either Asia Financial or EZ Financial, prepared a loan application and residential purchase contract based on the personal information that the straw buyer provided. The mortgage company would then submit a loan application to Countrywide for processing under the NINA program. Countrywide's loan amount, based on the sales price which was in turn based on a bogus appraisal, would be far in excess of the fair market value of the property. Countrywide would then disburse the amount of the loan to the seller. The seller would keep an amount equal to the equity in the house, and

---

[2] Sean and Dai both pleaded guilty and testified at Myna and Tam's trial.

the "profit"—the excess money that the seller obtained because of the fraudulently high appraisal—would be distributed among the conspirators.

The government presented evidence to show that Myna and Tam were involved in several parts of the scheme:

A.    Myna

The government claimed that Myna was involved in the sale of four properties, two of which were included in the indictment and two of which were not.

### 1.    The Fox Hunt Property

Myna, a mortgage broker for Ultima Real Estate Services, worked as the listing agent for a property at 6319 Fox Hunt Drive in Arlington, Texas.  The original listing price for the property was $239,000.  Sean told Myna that he could find a buyer for the Fox Hunt property if the seller, Ahn Nguyen ("Ahn"), would agree to have her house appraised at a higher value.  Morka prepared an appraisal report stating that the property was worth $440,000.  Myna told Ahn that the house would now be selling for that price.

Countrywide provided the loan for the transaction and wired the money to American Title Company, which then paid off Ahn's prior mortgages and wired the remainder to Ahn's personal BankOne bank account.  After the closing, on October 3, 2002, Myna called Ahn and told Ahn to meet her at the BankOne branch below Myna's office in Arlington, Texas.  Myna, Sean, and several other people were waiting for Ahn when she arrived at BankOne.  Ahn withdrew approximately $186,000 in cashier's checks from her account and distributed the checks to those involved in the scheme.  She kept the remaining money, which represented her equity in the Fox Hunt property.  According to the government, Myna expected to make between $10,000 and $30,000 from the deal in addition to her normal real estate commission.

### 2. The Silvercrest Property

Myna allegedly played a different role with respect to the fraudulent transaction involving 6727 Silvercrest Drive. In this instance, Myna let Sean use her personal bank account for the Silvercrest transaction in exchange for a fee. Sean had the seller of the house sign a document which authorized the title company to wire approximately $129,000 to Myna's bank account. After the closing for the sale of the Silvercrest property, an escrow officer for the title company duly wired the money into Myna's account. Myna gave Sean a cashier's check for the amount wired to her account, and Sean paid Myna between $5,000 and $10,000 in cash.

### 3. The Tabor and Rolling Hills Properties

Myna was involved in the sale of two other properties that the government did not include in its indictment. Myna acted as the seller's agent for the sale of properties at 319 Tabor Drive and 2723 Rolling Hills Lane, a role similar to the one that she played in the sale of the Fox Hunt property. With the Tabor property, Myna contacted Sean and said that she wanted to do the same type of deal as before, referring to the Fox Hunt sale. Myna was responsible for convincing the seller, Thuy "Cindy" Thai ("Cindy"), to sell her house for the fraudulently inflated price of $325,000, instead of $160,000, as Cindy originally had planned. With the Rolling Hills property, Myna told the seller, Chinh Kieu Le ("Chinh"), that "the price would be $230,000, but on paper it will be a different number." At the closing, Chinh, who read very little English, noticed that the sales price said $410,000, but Myna assured her that "it would not matter," and Chinh signed the contract. Myna informed Chinh that some additional money would be deposited in her account and that the money would be used to purchase cashier's checks for other people.

### B. Tam

Tam's role in the scheme was to find straw buyers to participate in the fraudulent real estate transactions. Sean testified that he allowed Tam to decide how much money to give to each straw buyer, directing Tam to split the remainder of the "profit" with Sean.

C.    The Trial

The government tried Myna and Tam in the same trial, along with one other defendant.[3]  Several witnesses that had important roles in the scheme, including Sean and Dai, the masterminds of the plan, testified against Myna and Tam.

A jury convicted Myna of one count of conspiracy to commit mail fraud and wire fraud and to engage in illegal monetary transactions (18 U.S.C. § 371), five counts of wire fraud (18 U.S.C. § 1343), one count of mail fraud (18 U.S.C. § 1341), and two counts of money laundering (18 U.S.C. § 1957).  The district court sentenced Myna to thirty months' imprisonment and ordered her to pay restitution in the amount of $899,809.63.  The jury also convicted Tam of one count of conspiracy to commit mail fraud and wire fraud and to engage in illegal monetary transactions (18 U.S.C. § 371), twelve counts of wire fraud (18 U.S.C. § 1343), two counts of mail fraud (18 U.S.C. § 1341), and three counts of money laundering (18 U.S.C. § 1957).  The district court sentenced Tam to sixty months' imprisonment for the conspiracy count and seventy-eight months on the other counts, with the sentences to run concurrently.  The district court also ordered Tam to pay restitution in the amount of $966,118.53.  Both defendants appealed their convictions.  We have jurisdiction over the district court's final judgment in this case pursuant to 28 U.S.C. § 1291.

II. ANALYSIS

---

[3] The government also prosecuted Xuyen Thi-Kim Nguyen in this trial, but she is not a party to this appeal.

A.    The government presented sufficient evidence to support Myna's convictions

   1.    Standard of Review

This court reviews a challenge to the sufficiency of the evidence de novo. United States v. Brown, 186 F.3d 661, 664 (5th Cir. 1999). "In resolving a sufficiency of the evidence claim, we must decide whether a rational trier of fact could have found that each element of the charged criminal offense was proven beyond a reasonable doubt." United States v. Freeman, 434 F.3d 369, 375-76 (5th Cir. 2005) (internal quotation marks omitted). Further, the court considers "all the evidence in a light most favorable to the government, drawing all inferences and credibility choices in its favor." Id. at 376. We will "consider the countervailing evidence as well as the evidence that supports the verdict in assessing sufficiency of the evidence." Brown, 186 F.3d at 664 (internal quotation marks omitted). Finally, "[i]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, a defendant is entitled to a judgment of acquittal." Id. (internal quotation marks omitted).

   2.    Discussion

Mail and wire fraud are specific intent crimes that require the government to prove that a defendant knew the scheme involved false representations. See United States v. Brown, 459 F.3d 509, 518-19 (5th Cir. 2006) (wire fraud); United States v. Rochester, 898 F.2d 971, 976 (5th Cir. 1990) (mail fraud). Myna claims that the government failed to provide sufficient evidence on this point. If the government did not show that Myna knew of false representations to support the mail and wire fraud convictions, Myna continues, then the conspiracy and money laundering convictions fail as well because they depend on Myna's involvement in a fraud. Myna also argues that the government did not present sufficient

evidence to convict her of the counts relating to the Silvercrest property. Finally, Myna argues that the government provided insufficient evidence to convict her of money laundering. Myna's arguments fail, however, because at trial the government presented sufficient evidence to demonstrate that (1) Myna was aware that the transactions involved at least three false representations, (2) Myna had knowledge of the illegality of the Silvercrest transaction, and (3) Myna had constructive possession of the illegal funds to support the money laundering convictions.

(a) False representations

(i) False representations regarding the value of the houses

Myna maintains that the government did not produce sufficient evidence to prove beyond a reasonable doubt that she knew that the straw buyers sought loan amounts for the Fox Hunt and Silvercrest properties that were based on fraudulently inflated appraisals. Instead, she argues that the government's evidence, at best, shows that she knew that the sales price exceeded the market value of the homes, but that a representation of a home's sales price is not necessarily a representation as to its value.

Viewing all evidence in the light most favorable to the government, however, a rational jury could find beyond a reasonable doubt that Myna knew that the sales prices and loan amounts for the Fox Hunt and Silvercrest properties stemmed from false appraisals. Sean testified that he agreed to help sell the Fox Hunt home on "the condition that, you know, we bump up the appraisal to a higher amount." Myna was not oblivious to the appraisal process, for she knew that an appraiser was coming to the Fox Hunt property and asked Ahn, the seller, to leave a key for the appraiser. This new appraisal nearly doubled the value of the house. Myna then convinced Ahn to raise the sales price from $239,000 to $440,000, a figure that matched exactly the bogus

appraisal value. Further, when Sean expressed a concern that Ahn would keep the excess money, Myna assured Sean that she was friends with Ahn and that Ahn would keep only her true equity, not the excess proceeds. Myna accompanied Ahn to the BankOne branch when Ahn withdrew the excess proceeds and wrote cashier's checks for a number of other people. A reasonable jury could conclude that if the price had increased for legitimate market reasons, presumably Ahn would not have written these checks to other people; she would have pocketed the excess value. Given the totality of the evidence, therefore, a jury could conclude that Myna knew Sean relied on false appraisals to increase the sales prices of both properties. Thus, the government presented sufficient evidence regarding these false representations.

(ii) False promises of the straw buyers as to their intentions to repay the loans

Myna argues that the evidence does not support the allegations in the indictment that referred to "fraudulent mortgage loan applications submitted by straw purchasers." She contends that the phrase "mortgage loan applications" refers only to the Uniform Residential Loan Application forms ("URLA forms") for the Fox Hunt and Silvercrest properties, and not to the "loan package" that includes other documents that do reference the fraudulent appraisals. The URLA forms do not make any representation about the value of the houses; instead, they simply state the loan amounts and purchase prices. The government, Myna argues, cannot prove fraud on the basis of the URLA forms because those forms make only true statements about the loan and sales prices.

Myna's claims are without merit. Read in the context of the entire indictment, the term "mortgage loan applications" does not refer simply to the URLA form, but to the entire loan application package. Additionally, even if the term "mortgage loan applications" refers only to the URLA form, the URLA form

for the Fox Hunt property can serve as a basis for fraud because the purchase price listed on the form was derived from the fraudulently inflated appraisal. As to the Silvercrest property, the purchase price on the URLA form was left blank, but the Silvercrest URLA form seeks a loan amount of $318,750 even though the seller originally sought $184,900 for the property. Thus, a jury could reasonably infer that the inflated loan amount was a reflection of the bogus appraisal. The jury also could conclude that Myna was aware of the loan application. As an experienced mortgage broker, Myna almost certainly would have known that Countrywide would need a loan application from the buyer before giving a several hundred thousand dollar home loan. Indeed, even if the statements on the URLA forms are themselves correct, the forms still can serve as a basis for a mail fraud conviction:

> We recognize that both innocent mailings (i.e. those that do not contain a misrepresentation) and mailings between innocent parties can support a mail fraud conviction. However, the mail fraud statute does not merely require that a scheme to defraud cause a mailing; it also requires that the mailing that is caused be a part of the execution of the fraud or be incident to an essential part of the scheme.

United States v. Ingles, 445 F.3d 830, 837-38 (5th Cir. 2006) (internal citations and alterations omitted). Here, the URLA forms were part of the execution of a fraud and therefore can be the basis of mail and wire fraud, notwithstanding the fact that the forms contained true statements of the purchase prices or loan amounts. Thus, the government presented sufficient evidence for a jury to conclude that Myna knew that the straw buyers were submitting fraudulent loan applications in furtherance of the scheme.

(iii) False promises as to the buyers' intentions to live in the homes

Myna claims that the government presented insufficient evidence to show that she knew that the buyers did not intend to move into the houses, which was a requirement of the NINA loans.  Sean testified, however, that both Myna and Ahn, the seller of the Fox Hunt property, knew the details of the transaction.[4] Specifically, Sean stated that the goal of the transaction was to "appraise to a higher value and make a profit."  A reasonable jury could infer that if Myna knew of the details of the plan and wanted to "make a profit," then she also knew that Sean never intended to find a legitimate buyer at the higher price.  Myna fails to explain why Sean's extensive testimony and the other evidence regarding the fraud was insufficient to demonstrate that she knew that the straw buyers never planned to live in the houses.

(b) Myna's knowledge of illegality

Myna contends that the government failed to demonstrate that she knew that the Silvercrest transaction was illegal.  Specifically, Myna claims that she did not play any role in selling the Silvercrest property, instead simply receiving the proceeds from the transaction in her account and writing cashier's checks to various people to disburse the money.  The record demonstrates, however, that Myna knew that the fraudulent scheme Sean used for the Silvercrest property was the same one he used in the earlier Fox Hunt sale.  In particular, Sean testified that Myna was willing to receive the money and distribute it to the others involved in the scheme, much like Ahn had done for the Fox Hunt deal.  In response to whether Myna was aware that the wire transfer to her "was another one of those housing deals," Sean testified, "By this time Myna knew . . . . She agreed to do it with the condition that I have to compensate her." Additionally, Myna knew how the illegal scheme worked in the Fox Hunt

---

[4] Sean testified that Ahn was not involved in the scheme, but that she knew that raising the appraisal price would sell her house faster.

transaction, and the Fox Hunt and Silvercrest deals involved the same basic fraudulent operation. Based on this evidence, taken in the light most favorable to the government, a jury could conclude beyond a reasonable doubt that Myna knew that the Silvercrest transaction was illegal.

> (c) Myna's constructive possession of illegal funds for the money laundering convictions

Myna argues that the government presented insufficient evidence to support her conviction for money laundering under 18 U.S.C. § 1957. Myna claims that the proceeds from the Fox Hunt transaction were not "proceeds from a prior completed criminal offense" because, immediately prior to the issuance of the relevant cashier's checks, the funds lay in Ahn's personal bank account. Because Ahn "was not a perpetrator" when she wrote the check underlying the money laundering account, Myna contends, the fraud was not complete and the money transfer did not violate § 1957.

"To obtain a conviction under § 1957, the government must prove that the defendant knowingly engaged, or attempted to engage, in a monetary transaction involving criminally derived property, in excess of $10,000, derived from specified criminal activity." United States v. Leahy, 82 F.3d 624, 635 (5th Cir. 1996) (citing 18 U.S.C. § 1957(a)). For a defendant to violate the statute, "the funds in question must already be proceeds obtained from a criminal offense when the defendant transfers them." Id. (internal quotation marks omitted). In the case of "fraudulent schemes," the funds become proceeds of a criminal offense "at the latest when the scheme succeeds in disgorging the funds from the victim and placing them into the control of the perpetrators." Id. (citing United States v. Allen, 76 F.3d 1348, 1361 (5th Cir. 1996)). Finally, "[c]ontrol is established once money is placed into a perpetrator's account." Id.

In Leahy, this court sustained a § 1957 conviction even though an innocent third party initially received the funds because the evidence showed that the defendants had control over the third party's account. Id. at 635-36. The Leahy court cited, with approval, United States v. Savage, 67 F.3d 1435, 1443 (9th Cir. 1995), where the Ninth Circuit noted in upholding a money laundering conviction that the "funds were clearly at [the defendant's] disposal at the time of the deposit—the record indicates that the parties named on the accounts transferred the money at his request. It is irrelevant that the accounts were not in [the defendant's] name." Id. Myna's attempt to distinguish Leahy by arguing that a contract in that case governed the automatic disbursement of funds to the third party is unavailing. Leahy did not fashion a rule in which the government can establish control only when payments from the third party account are automatic and based on a contract. Instead, the defendants in Leahy had sufficient control over the funds because, for all intents and purposes, they directed the disbursement of the funds from the third party account to the defendants' accounts. Leahy, 82 F.3d at 635-36.

As in Leahy, the evidence here demonstrates that Myna had sufficient control over Ahn's account after the Fox Hunt property closing. A jury could infer control based on the following evidence: (1) Myna explained to Ahn that she would not be allowed to keep the entire $440,000 from the sale, (2) Ahn understood and agreed that the surplus money would be transferred to others, (3) Myna reassured Sean that Ahn would not keep all of the funds, and (4) Ahn transferred the money at Sean and Myna's request and in their presence. This evidence of Myna's constructive possession and control over the Fox Hunt proceeds in Ahn's account supports Myna's conviction for money laundering.

B.    The district court erred in admitting summary witness testimony, but that error was harmless

Myna contends that the district court erred in admitting the testimony of FBI financial analyst Beth Huntley ("Huntley") as summary witness testimony under Federal Rule of Evidence 1006 over the objection of Tam's counsel.[5]

### 1. Standard of Review

We review the district court's evidentiary ruling for abuse of discretion. United States v. Hart, 295 F.3d 451, 454 (5th Cir. 2002). "Review of evidentiary rulings is heightened in a criminal case." United States v. Gutierrez-Farias, 294 F.3d 657, 662 (5th Cir. 2002) (citing United States v. Anderson, 933 F.2d 1261, 1268 (5th Cir. 1991)). If the district court erred in its evidentiary ruling, the error can be excused if it was harmless, particularly if there is "other overwhelming evidence of [the defendant's] guilt." United States v. Williams, 957 F.2d 1238, 1241 (5th Cir. 1992). This court has defined harmless error as "any error, defect, irregularity or variance that does not affect substantial rights." United States v. Taft, 447 F.3d 421, 425 (5th Cir. 2006) (citing FED. R. CRIM. P. 52(a)). "The government bears the burden of proving beyond a reasonable doubt that the error was harmless." Id.

### 2. Discussion

Federal Rule of Evidence 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

We have previously recognized that the rule "does not specifically address summary witnesses or summarization of trial testimony." United States v.

---

[5] The district court treated the objection of one defendant as an objection of all the defendants.

Fullwood, 342 F.3d 409, 413 (5th Cir. 2003). This omission is "significant," for "plainly, the rule does not contemplate summarization of live testimony presented in court." Id. (internal quotation marks and alterations omitted). Nevertheless, for complex cases, this court has allowed "summary witnesses in a limited capacity." Id.

Although the district court may admit summary witness testimony in limited circumstances, this court has repeatedly warned of its dangers. We have stressed that the purpose of summary evidence "is not simply to allow the Government to repeat its entire case-in-chief shortly before jury deliberations." Id. Summary witnesses may "not be used as a substitute for, or a supplement to, closing argument." Id. at 414.

Myna argues that Huntley's summary witness testimony exceeded the bounds of Rule 1006 and that the district court committed reversible error by admitting it. Huntley provided a summary of her investigation and authenticated a summary chart that described the operation. A review of the record reveals that at least some of Huntley's testimony, and in particular Huntley's reference to Myna as a "co-conspirator," was inappropriate. This testimony reached the ultimate issue of Myna's mental state because one cannot be an unwitting conspirator. United States v. Dadi, 235 F.3d 945, 950 (5th Cir. 2000). This court has stated that "[a]n expert in a criminal case may not . . . offer an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged. Such issues are matters for the trier of fact alone." Gutierrez-Farias, 294 F.3d at 662 (citing FED. R. EVID. 704(b)). By calling Myna a "co-conspirator," Huntley was inferring that Myna had the requisite mental state for the criminal act. Huntley's testimony also exceeded the bounds of Rule 1006 because she stated that her testimony was premised, in part, on out-of-court statements that

unspecified witnesses made to FBI agents during the investigation. This testimony was in error because the supporting evidence must have been "presented previously to the jury to establish any assumptions reflected in the summary." Hart, 295 F.3d at 458 (internal quotation marks omitted). The out-of-court statements to which Huntley referred may have been in general agreement with the evidence that the government had presented, but these statements were not in fact presented previously to the jury. Thus, while summary witnesses may be appropriate in complex cases in certain circumstances, they are improper for introducing evidence that the jury has not previously heard.

We repeat our admonition that the government may not use summary witnesses for inappropriate means. See Fullwood, 342 F.3d at 414. "While such witnesses may be appropriate for summarizing voluminous records, as contemplated by Rule 1006, rebuttal testimony by an advocate summarizing and organizing the case for the jury constitutes a very different phenomenon, not justified by the Federal Rules of Evidence or our precedent." Id. Although this case is complex because it involved many witnesses and hundreds of exhibits, Huntley's testimony inappropriately made conclusions as to Myna's state of mind and improperly introduced evidence from out-of-court witnesses.

The government escapes reversal and remand for a new trial on this point only because the error in admitting Huntley's testimony did not result in substantial harm to Myna. See Gutierrez-Farias, 294 F.3d at 662. In Gutierrez-Farias, we found that an error in the submission of evidence was harmless because the offending testimony was only a "small part of an otherwise strong case." Id. at 663; see also United States v. Washington, 44 F.3d 1271, 1283 (5th Cir. 1995) (stating that any possible error in the admission of testimony was harmless given that the government had presented overwhelming evidence

establishing the defendant's guilt). Because it is highly unlikely that Huntley's testimony contributed to Myna's conviction, we find that any error in the admission of Huntley's testimony was harmless. See Williams, 957 F.2d at 1242 ("[U]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction, reversal is not required.") (internal quotation marks omitted).

Huntley's testimony served only as a small portion of the government's overwhelming case against the defendants. The government presented over two dozen witnesses who testified as to Myna's role in the Fox Hunt and Silvercrest transactions. These witnesses represented various aspects of the scheme, from the masterminds of the plan, to the straw buyers, to the sellers, and finally to the investigators who unraveled the operation. Additionally, the government presented strong circumstantial evidence that linked Myna to the fraudulent transactions. Indeed, the government does not rely on Huntley's testimony at all in arguing that it presented sufficient evidence to convict Myna on all counts. Instead, the majority of Huntley's testimony was an appropriate summary of evidence that Huntley had reviewed as part of her investigation and that the jury previously had heard. Finally, the district court attempted to mitigate any error through its instructions to the jury. During Huntley's testimony, the district court told the jury that "the witness is testifying about her conclusions from the documents that she reviewed. The ultimate decision about whether her conclusions are correct will be reflected in your verdict . . . ." Similarly, the district court cautioned in the jury instructions that "[c]ertain charts and summaries have been received into evidence. Charts and summaries are valid only to the extent that they accurately reflect the underlying supporting evidence. You should give them only such weight as you think they deserve." Thus, the district court instructed the jury not to rely on Huntley's summary

16

testimony if the jury did not agree with Huntley's conclusions or if her testimony did not "accurately reflect the underlying supporting evidence." See Gutierrez-Farias, 294 F.3d at 663 (noting that the district court attempted to cure any defect in the admission of evidence through a jury instruction).

In sum, once again we caution the government not to rely on improper summary witness testimony. Because the error was harmless given the strength of the government's case and the district court's limiting instructions, however, we reject Myna's request for a new trial.

C. The district court properly admitted evidence of unindicted transactions

Myna's final argument is that the district court erred in admitting, over her numerous objections, evidence of her involvement in two subsequent real estate transactions—the Tabor and Rolling Hills deals—that employed the same scheme as the Fox Hunt sale.

1. Standard of Review

We review the district court's decision to admit evidence of the Tabor and Rolling Hills transactions for an abuse of discretion. See Hart, 295 F.3d at 454; Gutierrez-Farias, 294 F.3d at 662.

2. Discussion

The district court first stated that it was admitting the evidence of the Tabor and Rolling Hills transactions under Federal Rule of Evidence 402 as relevant evidence that is intrinsic to the charged offenses. During the jury instruction conference, however, the court ultimately admitted the evidence under Rule 404(b). The district court correctly concluded that the Tabor and Rolling Hills evidence was not intrinsic to the Fox Hunt and Silvercrest transactions. "Evidence of acts other than conduct related to the offense is intrinsic when the evidence of the other act and the evidence of the crime

17

charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." United States v. Yi, 460 F.3d 623, 632 (5th Cir. 2006) (internal quotation marks omitted). Though the conspirators used the same scheme at all of the properties, each deal was a distinct and distinguishable event. Cf. United States v. Williams, 900 F.2d 823, 825 (5th Cir. 1990) (noting that nineteen similar packages that the defendant received in the mail before he received the package for which he was indicted were "distinct and distinguishable events"). The district court correctly admitted the evidence, however, as extrinsic evidence of other crimes, wrongs, or acts under Rule 404(b).[6] In United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc), this court held that Rule 404(b) calls for a two-step test: "First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of [R]ule 403." Id. The district court, however, is not required to conduct an on-the-record Beechum analysis unless the defendant requests one. United States v. Morgan, 117 F.3d 849, 861 (5th Cir. 1997). Here, the district court did not conduct an on-the-record Beechum analysis, but we may assume that the district court made an implicit finding that (1) the evidence of the unindicted transactions was relevant

---

[6] Federal Rule of Evidence 404(b) provides:

> Other Crimes, Wrongs, or Acts.—Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

to an issue other than Myna's character and that (2) the probative value of the evidence substantially outweighed its prejudicial effect. This conclusion was not in error. First, the evidence of the Tabor and Rolling Hills deals demonstrated how the operation worked and therefore established Myna's knowledge and intent. Second, Myna has failed to show how any prejudicial effect of this evidence outweighed its probative value. More directly, the district court issued a limiting instruction to notify the jury that it could use the extrinsic evidence only to ascertain Myna's mental state.[7] See, e.g., Williams, 900 F.2d at 827 ("As long as it is clear to the jury that the extrinsic evidence of the prior mailings is presented only to show modus operandi to prove knowledge and intent, there is little danger that presentation of the extrinsic evidence will cause unfair prejudice . . . ."). Additionally, the district court's prior instruction regarding Rule 402 did not conflict on a material point with this jury instruction, as both instructions made it clear that the jury could not convict the defendants merely because the jury found that the defendants had committed other uncharged offenses. See Nowell v. Universal Elec. Co., 792 F.2d 1310, 1316 (5th Cir. 1986) (discussing the "difficulty created by inconsistent or contradictory instructions on a material point") (emphasis added). Accordingly, the district court appropriately admitted this evidence as extrinsic under Rule 404(b) and correctly issued a limiting instruction.

D. Tam did not receive ineffective assistance of counsel

---

[7] With respect to the Tabor and Rolling Hills evidence, the district court instructed the jury as follows:

> [Y]ou may consider this evidence only insofar as it might, in your judgment, reflect on whether the Defendant Myna Tran had the state of mind or intent necessary to commit the crimes charged in the indictment; or whether she acted according to a plan for commission of a crime; or whether she committed the crimes for which she is on trial by accident or mistake. These are the limited purposes for which any evidence with respect to the Tabor and Rolling Hills properties may be considered.

Tam argues that his counsel provided ineffective assistance, resulting in prejudice.

### 1.     Standard of Review

In Strickland v. Washington, 466 U.S. 668 (1984), the Supreme Court articulated the standard for establishing an ineffective assistance of counsel claim. Tam must demonstrate both that (1) his counsel's performance was deficient and (2) his counsel's deficient performance prejudiced his defense. See Strickland, 466 U.S. at 687. A counsel's performance is deficient if it "fell below an objective standard of reasonableness." Id. at 688. The Supreme Court has stated that judicial scrutiny of a counsel's performance must be "highly deferential." Id. at 689. A reviewing court should make every effort "to eliminate the distorting effects of hindsight" and to "evaluate the conduct from counsel's perspective at the time." Id. Deficient performance results in prejudice when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Although this court typically does not address an ineffective assistance of counsel claim on direct appeal unless the defendant presented the claim to the district court, Tam argues that his counsel's deficient performance is readily apparent from the record. See United States v. Navejar, 963 F.2d 732, 735 (5th Cir. 1992) (stating that this court evaluates "claims of inadequate representation on direct appeal only in rare cases where the record allows us to evaluate fairly the merits of the claim") (internal quotation marks and alternations omitted).

### 2.     Discussion

Tam argues that his counsel should have objected to the testimony of one of the straw buyers, Hong Duong ("Duong"). Duong testified that he pleaded

guilty to his role in one of the fraudulent real estate transactions. He later stated, however, that he did not know that the real estate transaction was fraudulent. The district court, out of the jury's presence, determined that it could not accept Duong's plea agreement given the discrepancies between the agreement and his testimony. The district court decided not to tell the jury that the court was withdrawing Duong's plea agreement, and neither side objected. Tam now argues, however, that his trial counsel's failure to object to Duong's testimony amounted to ineffective assistance of counsel because it left the jury with the impression that one could be guilty of conspiracy without having an intent to defraud. The government subsequently filed a superseding information against Duong, charging him with misprision of a felony.

Tam's argument is without merit. First, Tam fails to show why his counsel acted unreasonably in failing to object to the court's decision not to inform the jury about the withdrawn plea, especially because doing so would have highlighted Duong's testimony. Indeed, this was a joint trial of several defendants, and none of the defendants' lawyers objected to the court's decision on this issue. Second, Tam failed to show that his counsel's trial tactics amounted to prejudice. Tam presented no evidence, beyond his own assertion, that Duong's testimony left the jury with the impression that one can be guilty of conspiracy without the intent to defraud. In fact, the district court specifically cautioned against this conclusion in its jury instructions, stating that "a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of a conspiracy, does not thereby become a conspirator." In sum, Tam fails to meet either of the Strickland prongs, dooming his ineffective assistance of counsel claim. See 466 U.S. at 687.

III. CONCLUSION

For the reasons stated above, we affirm Myna Tran's and Tam Nguyen's convictions.

AFFIRMED.