**UNITED STATES of America,
Plaintiff–Appellee**

v.

**Ben Harris ECHOLS, Defendant–
Appellant.**

No. 13–20238.

United States Court of Appeals,
Fifth Circuit.

June 25, 2014.

Nina Goodman, U.S. Department of Justice, Washington, DC, Renata Ann Gowie, Assistant U.S. Attorney, U.S. Attorney's Office, Houston, TX, for Plaintiff–Appellee.

David Keith Isaak, Esq., Gerger & Clarke, Houston, TX, for Defendant–Appellant.

Before HIGGINBOTHAM, CLEMENT, and HIGGINSON, Circuit Judges.

PER CURIAM: *

Appellant Ben Echols, a Houston gastroenterologist, appeals from his conviction and sentence for conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1), and six counts of making false statements in connection with the delivery of or payments for health care benefits, items, or services (Counts 2–7), in violation of 18 U.S.C. § 1035. The jury found Echols defrauded Medicare by signing hundreds of plans of care (POCs) au-

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

thorizing home health care for patients he had not seen or treated. The district court sentenced Echols to 63 months of imprisonment on Count 1 and to concurrent 60–month terms on Counts 2–7 and ordered him to pay $2,918,830.51 in restitution to Medicare. We AFFIRM the district court's verdict and sentence.

## FACTUAL BACKGROUND

### A. Medicare Pays for Home Health Care Services Provided to Eligible Beneficiaries with Doctor Referrals

Medicare, a taxpayer-funded insurance program, pays claims submitted by home health care companies for skilled nursing services provided to eligible Medicare beneficiaries. To be eligible for home health care, a Medicare beneficiary must meet three requirements: (1) the patient must be homebound, (2) must be under a physician's care, and (3) must require specialized skilled nursing. The requirement that a patient be under a physician's care means that the physician must have seen and evaluated the patient.[1] The referring physician—typically the patient's primary care physician, surgeon, etc.—is responsible for making sure the patient meets the requirements for Medicare-funded home health care.

Once the home health care company receives a physician referral, it sends a registered nurse to assess the patient and complete a detailed evaluation, which is then used to generate a POC for the patient. The POC shows the patient's name and other demographic information, diagnosis, medications, orders from the physician, and information about services that the home health care company will provide. The home health care company then sends the POC to the referring physician for his or her signature or review. The POC contains a certification by the referring physician that the patient is "confined to his/her home and needs intermittent skilled nursing care" or other services, and that "[t]he patient is under my care and I hereby authorize the services on this plan of care and will periodically review the plan." The POC also warns that "[a]nyone who misrepresents, falsifies, or conceals essential information required for payment of federal funds may be subject to fine, imprisonment, or civil penalty under applicable federal laws."

If the physician certifies the need for home health care, Medicare will pay for a 60–day period (or "episode" of care), with the option for 60–day extensions with the physician's recertification. The home health care company submits to Medicare a claim for skilled nursing services that lists the physician's name and Medicare provider number; the physician is not copied on these bills. Before submitting a claim to Medicare for a full episode of care, the home health care company must have in its files a POC signed by the physician, and should keep the POC on file in event of an audit.

### B. Echols Authorized Home Health Care for Patients He Had Not Seen or Treated

Dr. Ben Echols served as medical director of two home health care agencies,

---

1. Echols counters that: "Until January 1, 2010, there was no requirement that a physician personally examine the patient to order home health care. 42 U.S.C. § 1395n(a)." Echols's false statements on POCs, as charged, date from September 16, 2007, to April 14, 2010. The requirement that a patient be under a physician's care was previously interpreted to mean that the doctor must have seen or corresponded with the patient at least once, and the amendment added the requirement that the physician have a "face-to-face encounter" with the patient "during the 6–month period preceding such certification" for home health care. 42 U.S.C. § 1395n(a)(2)(A)(iv).

Family Home Healthcare (Family) and Houston Compassionate Care (Compassionate). Rather than receiving physician referrals, Family and Compassionate recruited Medicare beneficiaries by asking if they were interested in home health care services. Both companies then asked the patients' primary care doctors to sign the POCs. If the physicians refused, employees took the POCs and other forms to Echols for his signature. Echols signed the forms without asking questions, requesting the patients' files, or making any changes—even though many of the Compassionate forms listed other doctors' names and National Provider Identifier (NPI) numbers. Doctors listed on the claims signed by Echols testified that they had not authorized home health care.

Family and Compassionate paid Echols $1,500 and $700 per month, respectively, in his capacity as medical director. Family and Compassionate employees typically brought Echols checks or cash as payment when they brought the forms for his signature. In all, Family and Compassionate paid Echols more than $100,000.

## C. The Defense Case

In his defense, Echols testified that he acted in good faith and wrongly trusted that what Family, Compassionate, and their employees asked him to do was legal. Echols conceded that, while he did sign POCs for Compassionate patients that he had not seen, he did so only when Compassionate vouched that the patient's primary physician had given verbal orders for home health care, the patient had been discharged, and attempts to contact the patient's primary care doctor had failed. He further testified that the policies of Compassionate, subject to regulation by Medicare and the State, allowed him as medical director to sign POCs when the treating physician could not be reached to sign the form, and he believed that his actions were appropriate to bring Compassionate into regulatory compliance. His longstanding relationship with Compassionate owner Valnita Turner (who once worked as Echols's nurse) increased his trust in Compassionate's representations. Regarding Family, Echols believed that Family staff only brought him POCs to sign for patients for whom he or his nurse practitioner, Tonia Jackson, had orally ordered health care.

Echols further introduced evidence (including the testimony of his ophthalmologist) that his failing eyesight made it difficult for him to read the health care forms, and thus increased his reliance on Family, Compassionate, and their employees to accurately prepare the forms. He also maintains "it was common in his practice for him to trust others to prepare accurate forms."

Finally, Echols emphasized that, while he was paid for his services as medical director, his salary was fixed and unrelated to the number of POCs signed. Instead, he maintains that the payment was compensation for all of his duties as medical director, though he admitted at trial that the Compassionate medical director job description does not mention seeing patients, signing POCs, or signing physicians' orders.

## D. Disposition

The jury convicted Echols of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349 (Count 1), and six counts of making false statements in connection with the delivery of or payments for health care benefits, items, or services (Counts 2–7), in violation of 18 U.S.C. § 1035.

The PSR calculated Echols's intended—as well as actual—loss under U.S.S.G.

§ 2B1.1(b)(1) to be $5,390,000.[2] It recommended an offense level of 24.[3]

The district court adopted the PSR's intended loss calculation but found actual loss of $2.9 million since Medicare denied some of Echols's claims.[4] The district court also applied a two-level enhancement under § 3B1.3 for abuse of trust, resulting in an offense level of 26 and a sentencing range of 63–78 months. The district court sentenced Echols to 63 months of imprisonment on Count 1 and concurrent 60–month terms on Counts 2–7, and ordered him to pay the actual loss of $2,918,830.51 in restitution to Medicare.

Echols timely appealed. On appeal, he argues that (1) the admission of the case agent's testimony as a summary witness was reversible plain error; (2) the district court abused its discretion by declining to give Echols's proposed jury instruction on good faith; and (3) the district court incorrectly calculated the loss attributable to Echols at sentencing because it failed to require the prosecution to prove that the home health care services provided by Family and Compassionate were not medically necessary.

## DISCUSSION

### A. Admission of Case Agent's Testimony

■ On appeal, Echols argues that federal case agent Korby Harshaw's testimony as the government's final witness exceeded the bounds of proper witness testimony. Echols contends that, rather than merely offering charts or summaries of voluminous records, Harshaw impermissibly repeated the government's case-in-chief. Echols further maintains that Harshaw's testimony violated his rights under the Confrontation Clause because Harshaw testified about his patient and physician interviews establishing that certain patients had not seen Echols.

Significantly, Echols did not object to Harshaw's testimony at trial. This means that we review his claims for plain error only. FED.R.EVID. 103(e). The defendant must show any error was plain and affected his substantial rights, i.e. there is a "reasonable probability that the result of the proceedings would have been different but for the error." *United States v. Montes–Salas*, 669 F.3d 240, 247 (5th Cir. 2012). The court "has the *discretion* to remedy the error—discretion which ought to be exercised only if the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Puckett v. United States*, 556 U.S. 129, 135, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009) (quoting *United States v. Olano*, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)). Echols's failure to object with specificity is compounded on appeal by the

---

2. The PSR totaled $1,000,000 and $4,040,000 for claims submitted to Medicare through Family and Compassionate, respectively, that listed Echols as the attending physician, plus $350,000 for POCs signed by Echols that listed another physician as the patient's attending physician.

3. "The substantive offense cited in the conspiracy is a violation of 18 U.S.C. § 1347, the guideline for which is found in U.S.S.G. § 2B1.1. The base offense level at U.S.S.G. § 2B1.1(a)(1), is 6. Since the actual loss of $5,390,000, exceeded more than $2,500,000,

but was less than $7,000,000, the offense level is increased by 18 levels pursuant to U.S.S.G. § 2B1.1(b)(2)(J). Therefore, the base offense level pursuant to U.S.S.G. § 2X1.1(a), is 24."

4. Even using the actual loss figure of $2.9 million, rather than the intended loss of $5.39 million, Echols's base offense level remained the same as both amounts fell within the $2.5 million to $7 million range under U.S.S.G. § 2B1.1(b)(1)(J). *See* U.S.S.G. § 2B1.1, comment. n. 3.(A) ("loss is the greater of actual loss or intended loss").

fact that he lists numerous complaints about witness Harshaw, including the following: (1) "[i]mproper [u]se ... as a '[s]ummary [w]itness'"; (2) "blurr[ing] the line between witness and advocate" or "deliver[ing] a sworn closing argument"; (3) "a witness with no personal knowledge"; (4) "parroting the prosecutor's argument" in response to "leading questions"; (5) giving testimony that "was unnecessary and cumulative" of other witnesses; (6) "vouching"; and (7) "argumentative." Each complaint, however, properly addressed at trial and on appeal should trigger different correctives,[5] whereas Echols designates only an overarching error as one of improper "summary" testimony. Neither party has pointed to an instance in this record when Harshaw was offered as a "summary witness," however. That is significant because Echols acknowledges, and the record confirms extensively, that Harshaw properly authenticated and was the admitting witness for numerous summaries of voluminous writings, proper under Rule 1006. *See United States v. Nguyen,* 504 F.3d 561, 571–72 (5th Cir.2007); *United States v. Bishop,* 264 F.3d 535, 548 (5th Cir.2001); *United States v. Taylor,* 210 F.3d 311, 315 & n. 10 (5th Cir.2000); *Unit-* *ed States v. Castillo,* 77 F.3d 1480, 1499 (5th Cir.1996). The considerable majority of his testimony performed this approved evidentiary function. In fact, on cross-examination, defense counsel utilized Harshaw for the same valid purpose of laying a foundation for "the content of voluminous writings...." FED.R.EVID. 1006. It is further significant because our caselaw has affirmed separately that expert testimony frequently has a summarizing character as to the "facts or data" underlying the expert's testimony. *See United States v. Moore,* 997 F.2d 55, 57–59 (5th Cir.1993). Third, it is significant because we have approved of "summary" testimony in a third, albeit narrow, circumstance, namely when a witness present through trial (presumably without objection under Rule 615), such as a case agent, testifies under court control (either in a Rule 1006 role or pursuant to Rule 611(a)(1)–(2) to enhance truth-finding and to avoid wasting time). *See United States v. Armstrong,* 619 F.3d 380, 383–85 & n. 1 (5th Cir.2010); *Taylor,* 210 F.3d at 315 & n. 10; *United States v. Winn,* 948 F.2d 145, 157–59 (5th Cir.1991). For example, Echols established on cross-examination that Harshaw had "heard" government expert testimony, whereupon

---

**5.** Corresponding to this list, though not exhaustively, (1) "summary" evidence frequently is a misnomer or shorthand that is complicating, not clarifying. Echols candidly acknowledges on appeal that "while part of Agent Harshaw's testimony may have been appropriate under Fed.R.Evid. 1006, much of it was ... advocacy masquerading as 'evidence' under oath." Yet in the argument portion of his principal brief where this divided assertion is presented, Echols gives no supporting record citations; likewise, in Echols's reply brief, and again without exact record specificity as required by 5th Cir. Rule 28.2.2, the concession is made that whereas some testimony "was perhaps appropriate" under Rule 1006, other testimony was "inappropriate"; (2) a witness who testifies beyond his knowledge, or into topics that are unhelpful or the province of others should be cabined by a multitude of precise rules, such as Rule 403 ("unfair prejudice, confusing the issues, misleading the jury"), Rule 601 (competency), Rule 602 (requirement of personal knowledge), and Rule 701 (scope of lay witness opinion testimony); (3) lack of personal knowledge should be considered according to Rule 602; (4) "parroting" answers to "leading questions" should prompt briefing to us pertinent to Rule 611(c) and Rule 403; (5) an allegation of "cumulative" or repetitive testimony would be examined under Rule 403's balancing scheme for "needlessly presenting cumulative evidence"; and (6)–(7) courts typically assess a "vouching" or "argumentative" contention with attention to Rule 403's guidance against "wasting time" and Rule 611(a)'s assignment of "reasonable control" to trial judge discretion.

Echols then elicited from Harshaw aspects of that earlier testimony. As Echols should have himself, the government interposed objections, some sustained and some not, that such questions asked Harshaw to misstate earlier testimony or to recite hearsay.

With that admonition for specificity openly stated, and cognizant of review here only for plain error, we reiterate that summary evidence is appropriate in several scenarios. First, Rule 1006 explicitly allows introduction of a "summary, chart or calculation" when the "content of voluminous writings ... cannot be conveniently examined in court." FED. R. EVID. 1006; see *Nguyen*, 504 F.3d at 571–72; *Bishop*, 264 F.3d at 548; *Castillo*, 77 F.3d at 1499. Second, expert witnesses are authorized to offer opinion testimony that rests on facts or data that reasonably were relied on to form the expert opinion and hence may constitute summary opinion of a specialized character. FED.R.EVID. 702, 703; *Moore*, 997 F.2d at 57–59. Third, summary evidence, usually in the form of demonstrative aids but also, we have said, in complex cases, through witness testimony accompanying Rule 1006 evidence, may be admissible. See *Armstrong*, 619 F.3d at 383–85; *Taylor*, 210 F.3d at 315; *Winn*, 948 F.2d at 157–59.

In the context of testimony accompanying Rule 1006 summary evidence, we have held that summary testimony referencing prior testimony is appropriate so long as the testimony has an "adequate foundation in evidence that is already admitted," is unquestionably accurate, and is "accompanied by a cautionary jury instruction." *Armstrong*, 619 F.3d at 385; *United States v. Fullwood*, 342 F.3d 409, 414 (5th Cir. 2003). Similarly, we have emphasized that the evidence being summarized must be of sufficient complexity (numerous witnesses, technical testimony, and scores of exhibits) to be helpful under Rule 611(a) and not excludable under Rule 403 as cumulative. *Armstrong*, 619 F.3d at 385; *Fullwood*, 342 F.3d at 414.

We find that admission of case agent Harshaw's testimony was not plain error because these conditions were met. Harshaw's testimony summarized documentary evidence admitted at trial or allowable under Rule 1006. Echols himself offered such exhibit evidence through foundation testimony given by Harshaw. Harshaw only succinctly referenced patients' and doctors' testimony to remind the jury which witnesses the documentary evidence related to and said virtually nothing about the testimony of the government's principal trial witnesses. Notably, Harshaw's testimony has not been shown to be inaccurate or to relate to matters that were controverted as distinct from Echols's signing of orders and POCs for Medicare beneficiaries who were not his patients. Notably, also, the district court provided a cautionary Rule 1006 jury instruction,[6] and during closing arguments, the government never mentioned testimony given by Harshaw. Although Echols's trial took only three days and involved thirty exhibits, the case had complexity because it involved multiple billings for numerous patients over years.[7]

---

6. "Certain charts and summaries have been received into evidence. Charts and summaries are valid only to the extent that they accurately reflect the underlying supporting evidence. You should give them only such weight as you think they deserve."

7. We have expressed displeasure with the government's use of a "summary witness" to simply recapitulate prior testimony or prefigure a closing argument. See, e.g., *Fullwood*, 342 F.3d at 409, 414; *Castillo*, 77 F.3d at 1500. In *United States v. Nguyen*, 504 F.3d at 571, reviewing for abuse of discretion, we found that the case agent's testimony improp-

■ Harshaw's testimony likewise was not plain error insofar as it did not run afoul of the Confrontation Clause. The Sixth Amendment guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. That right is violated where the prosecution introduces "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford v. Washington,* 541 U.S. 36, 53–54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Harshaw testified that he interviewed some of the patients (as well as their physicians) for whom Echols signed POCs but for whom there were no office visits billed, and that these interviews helped him to conclude that Echols had never seen these patients. No contemporaneous objection was asserted. Harshaw did not relay out-of-court statements made by a patient or physician, but rather referenced his findings and minimally, elicited by both sides, referenced witnesses who had testified earlier at trial.

Even assuming arguendo that Harshaw's testimony extended to matters outside his personal knowledge, any conceivable infringement of his Confrontation Clause right was harmless. Harshaw made clear that he relied on his review of patient files and Medicare billing data to conclude that none of the patients in ques-

tion was seen by Echols. Moreover, his testimony was cumulative of other evidence—including Echols's own testimony—that Echols had signed orders and POCs for patients he had not seen. *See United States v. Yi,* 460 F.3d 623, 634–35 (5th Cir.2006) (Confrontation Clause error was harmless where testimony regarding out-of-court statements "was not particularly important to the government's case, was cumulative to other evidence, and was corroborated by other evidence"); *Nguyen,* 504 F.3d at 572–573 (objected-to error in admitting summary testimony that "improperly introduced evidence from out-of-court witnesses" was harmless where testimony "served only as a small portion of the government's overwhelming evidence"). Finally, as noted, the government made no reference at all to Harshaw's testimony in closing argument.

Accordingly, we hold the district court did not plainly err in admitting Harshaw's testimony.

## B. Good Faith Jury Instruction

■ Echols maintains that the district court abused its discretion by declining to give his proposed good faith jury instruction providing, among other things, that good faith was a complete defense to the charged offenses because it was "inconsistent with the finding of 'intent to defraud'

---

erly introduced evidence from out-of-court witnesses; however, we held that such error was harmless and therefore not reversible given the strength of the government's case and the district court's limiting instruction. As stated earlier, any appellate allegation of admissibility error benefits from—indeed requires—exact contemporaneous objection under Rule 103. Specific allegations of error pertaining to "summary" evidence should assert and discern among the aforementioned Rules 403, 611(a), 701–703, and 1006, and must connect on appeal to exact record references not only in the statement of the case,

but especially in the argument section. *See* 5TH CIR. R. 28.2.2. Our own independent review of Harshaw's testimony shows, for example, that on redirect examination Harshaw did likely twice extend inadvisably in directions prohibited to a lay witness, such as opinion testimony as to why an unindicted person was not in "trouble" along with Echols, and what Medicare regulations mean or whom Medicare "trusts." Neither of these points of testimony, however, is specified as error to us by Echols; we note them to highlight the importance of record-specific and rule-specific argument, at trial and on appeal.

that is required to convict a defendant for health care fraud" and "also inconsistent with the finding of actions that were done 'willfully' or 'knowingly,' an element of conspiracy, and aiding and abetting." Though the district court denied Echols's request, the court did instruct the jury that, in order to convict Echols, it must find that he acted "knowingly and willfully" with a specific intent to deceive in order to cause financial loss to another or bring financial gain to the defendant. Furthermore, the district court was clear that "mere presence" and "lack of knowledge of a conspiracy" were defenses to Count 1; and that as to Counts 2 through 7, "mistake or accident," as well as "negligent, careless or foolish" behavior, would not equate to knowledge.

We review a district court's refusal to include a defendant's proposed jury instruction for abuse of discretion. *United States v. Daniels*, 247 F.3d 598, 601 (5th Cir.2001). "[T]he trial judge is afforded substantial latitude in formulating" instructions. *Id.* (internal quotation marks and citation omitted).

We have held that it is not an abuse of discretion to refuse a requested good faith charge if the defendant is able to present his good faith defense to the jury through evidence, witnesses, closing arguments, or other jury instructions. *United States v. Brooks*, 681 F.3d 678, 705 n. 22 (5th Cir. 2012) ("A district court may refuse to submit an instruction regarding a good faith defense if the defense is substantially covered by the charge given and the defendant has the opportunity to argue good faith to the jury."); *United States v. Gray*, 751 F.2d 733, 736–37 (5th Cir.1985); *United States v. Fooladi*, 746 F.2d 1027, 1031 (5th Cir.1984). Further, we have held that instructions defining "knowingly" and "willfully" in the language used here are sufficient to convey the concept of good faith to the jury. *See, e.g., United States v. St. Gelais*, 952 F.2d 90, 93–94 (5th Cir. 1992) (where a jury instruction on specific intent "required a showing of 'bad purpose' for conviction," the jury "could only find specific intent after taking the evidence regarding good faith into account") (quoting *United States v. Rochester*, 898 F.2d 971, 979 (5th Cir.1990)).

During trial, Echols testified that he trusted the people who ran Family and Compassionate and that he was "very surprised" to learn of their Medicare fraud. Based on this testimony, Echols's counsel subsequently told the jury that Echols believed that "what I'm signing is okay, because it's coming from people I trust." Echols "was not inhibited by the lack of a good faith instruction from presenting his theory of the case" to the jury. *United States v. Storm*, 36 F.3d 1289, 1295 (5th Cir.1994); *St. Gelais*, 952 F.2d at 94 (refusal to give good faith instruction was not reversible error where defense counsel's closing argument did not mention the words "good faith," but nevertheless "put the concept of good faith and innocent motive before the jury"). We reiterate that the district court gave the jury instructions on specific intent and the meanings of "willfully" and "knowingly," and we also observe that Echols himself in closing argument highlighted the scienter willful blindness instruction accurately given.[8]

---

8. Echols urges us to rely on our decisions in *United States v. Goss*, 650 F.2d 1336, 1344 (5th Cir. Unit A July 1981), and *United States v. Fowler*, 735 F.2d 823, 828–29 (5th Cir. 1984), where we held that—at the defendant's request—the district court must still instruct the jury as to good faith even where a specific intent instruction was provided. However, our subsequent decisions made plain that "that any conflict among our prior decisions is resolved in favor of . . . *United States v. Fooladi*." *Gray*, 751 F.2d at 736. We reiter-

Accordingly, we find that the district court did not abuse its discretion in declining to instruct the jury on good faith.

## C. Loss Attributable to Echols

■ The district court found actual loss of $2,918,830.51, rejecting the PSR's intended loss calculation of $5,390,000 because Medicare denied some of Echols's claims. Based on this finding, the district court sentenced Echols to 63 months of imprisonment on Count 1 and concurrent 60–month terms on Counts 2–7, and ordered him to pay the actual loss of $2,918,830.51 in restitution to Medicare pursuant to the Mandatory Victims Restitution Act (MVRA), codified at 18 U.S.C. § 3663A. At resentencing, the government urged a loss calculation of $17.3 million.

At sentencing, Echols objected to the loss calculation and resulting sentence on the grounds that, in simply totaling the amounts of home heath care services billed by Family and Compassionate under Echols's provider number, the district court assumed that all of the amounts billed by Family and Compassionate with Echols's provider number were fraudulent. On appeal, Echols contends that, when calculating the loss attributable to him, the court should have required the government to prove that the Medicare beneficiaries listed on Echols-signed POCs did not qualify for Medicare-funded home health care, or these services were not provided. He argues that, absent such proof, the

district court should have reduced the loss figure to reflect "services that were medically needed and provided to the patients for whom false claims were submitted to Medicare." [9]

We review de novo the legality of restitution awards and the method of calculating loss. *United States v. Isiwele,* 635 F.3d 196, 202 (5th Cir.2011); *United States v. Mann,* 493 F.3d 484, 498 (5th Cir.2007). If the award is legally permitted, we review the amount for abuse of discretion. *Mann,* 493 F.3d at 498. We review the factual findings underlying the amount of restitution for clear error. *United States v. Sharma,* 703 F.3d 318, 322 (5th Cir. 2012). "A factual finding is clearly erroneous only if 'based on the record as a whole, we are left with the definite and firm conviction that a mistake has been committed.'" *Id.* (quoting *United States v. Teel,* 691 F.3d 578, 585 (5th Cir.2012)). "We may affirm in the absence of express findings 'if the record provides an adequate basis to support the restitution order.'" *Id.* (quoting *United States v. Blocker,* 104 F.3d 720, 737 (5th Cir.1997)).

"The MVRA authorizes restitution to a victim directly and proximately harmed by a defendant's offense of conviction" but "limits restitution to the actual loss directly and proximately caused by the defendant's offense of conviction." *Id.* at 322–23 (internal quotation marks and citations omitted). "In health-care fraud cases, an insurer's actual loss for restitution purposes must not include any amount that

---

ated that *Goss* "stands merely for the proposition that an instruction on specific intent will not always be sufficient to necessarily exclude a conclusion of good faith," *United States v. Daniel,* 957 F.2d 162, 170 (5th Cir.1992), and "must be read in light of later cases which indicate that the failure to instruct on good faith is not fatal when the jury is given a detailed instruction on specific intent and the defendant has the opportunity to argue good

faith to the jury." *Storm,* 36 F.3d at 1294 (quoting *Rochester,* 898 F.2d at 978).

9. On January 9, 2014, the district court reduced Echols's prison sentence to time served because of his failing health. Echols concedes that his arguments regarding loss attributable are moot as they relates to his term of incarceration.

the insurer would have paid had the defendant not committed the fraud." *Id.* at 324. While "the MVRA puts the burden on the government to demonstrate the amount of a victim's loss, a sentencing court may shift the burden of demonstrating such other matters as the court deems appropriate to the party designated by the court as justice requires." *Id.* at 325 (internal quotation marks and alterations omitted). We have recognized in prior healthcare fraud cases that "the amount fraudulently billed to Medicare/Medicaid is prima facie evidence of the amount of loss," though the parties may introduce evidence to the contrary. *Isiwele,* 635 F.3d at 203 (internal quotation marks and citations omitted).

As the district court explained, the trial evidence did not show that any of the patients on whose behalf Echols signed POCs would have qualified for Medicare-funded home health care—i.e. were homebound, in need of specialized services, and under Echols's care—or that legitimate medical services were actually provided to them. Nor did Echols provide a figure for the amount of "credit" he claimed was warranted for eligible, medically necessary services rendered. Indeed, the evidence introduced was to the contrary. Family and Compassionate paid recruiters to obtain information about Medicare beneficiaries, rather than receiving physician referrals. Both companies employed Echols to sign orders and POCs when patients' doctors declined to do so. Patients for whom Echols signed POCs at trial "testified that they were not Dr. Echols's patients, that they did not seek home health care and

that they did not need home health care." And Echols concedes that the government provided evidence that the six patients named in the indictment were ineligible for home health care. Moreover, Echols admitted that he had not seen patients for whom he signed POCs, and that he did not "know whether they needed [services] or not," meaning he could not fulfill the referring physician criteria necessary for eligibility under Medicare guidelines. In light of the undisputed evidence that Family and Compassionate engaged in fraudulent billing for home health care as charged for the years in question, the government was not required to elicit corresponding testimony from each of the hundreds of patients for whom Echols signed a fraudulent POC to prove the total loss amount.

Indeed, Echols's claim that the government must prove the services billed were not medically necessary erroneously assumes that covered services were actually provided—a fact the government disputes and for which Echols points to no evidence in the record. Once again, having presided at trial, the district court's factual finding is determinative: "There was no evidence that Dr. Echols provided legitimate medical services either to the home healthcare companies or to the people on whose behalf fraudulent Medicare claims were submitted by the home healthcare companies." For this reason, Echols's reliance on *United States v. Klein,* 543 F.3d 206, 213–15 (5th Cir.2008),[10] and *United States v. Medina,* 485 F.3d 1291, 1304–05 (11th Cir.2007),[11] is misplaced. Both *Klein* and

10. *Klein* involved a physician who was convicted of falsely billing insurance companies for drugs that his patients self-administered. Crucially, in *Klein,* "[n]o one dispute[d] that the patients needed those drugs and that the insurers would have to pay for the drugs had Klein merely written prescriptions." *Klein,* 543 F.3d at 213. By contrast, the government strongly disputes that the patients for

whom Echols signed POCs received or needed care. Moreover, Medicare would not have paid the claims without physician authorization, which would otherwise have been lacking without Echols's signature.

11. *Medina* concerned pharmacy owners convicted of paying kickbacks to doctors for using their pharmacies. Whereas the district

 

*Medina* concerned improper billing for prescription drugs. But whereas patients actually received the drugs at issue in *Klein* and *Medina,* Echols points to no evidence that legitimate medical services were actually provided to any of the patients for whom Echols signed POCs.

Accordingly, we find the district court did not err in finding the actual loss to Medicare to be $2,918,830.51 and ordering restitution in that amount.

## CONCLUSION

For the reasons given, we AFFIRM the district court's decision.

court determined the loss amount by totaling the amounts of claims for which kickbacks had been paid, the Eleventh Circuit reversed because there was no proof that the drugs that pharmacies dispensed were not medically necessary and would not have been rendered but for kickbacks. *Medina,* 485 F.3d at 1304–05. In contrast to *Medina,* Echols's illegitimate authorization of home health care constituted the essence of the fraud here. More-

over, the *Medina* patients actually received drugs, whereas the Medicare recipients in the present case did not actually receive home health care services.