IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 5, 2007**

Charles R. Fulbruge III
Clerk

No. 06-11198

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

JERRY EDWARD HOLBROOK

Defendant - Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before KING, GARZA, and BENAVIDES, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

The appellant, Jerry Edward Holbrook ("Holbrook"), argues that the district court's application of United States Sentencing Guideline Manual ("U.S.S.G.") § 2B1.1 (2005) erroneously calculated the actual loss of his fraud scheme. We disagree and affirm the sentence of the district court.

I

The facts of the offense itself are not contested. Holbrook and his co-defendants, Shane Sharp ("Sharp") and Randy Throckmorton ("Throckmorton"), were the owners and operators of Command Staffing, an employment agency in Dallas, Texas. Command Staffing was operating at a loss, so, to increase their cash flow, Holbrook and his co-defendants created fictitious customer accounts

showing that six companies owed Command Staffing money. In March 2002, Command Staffing entered into a master purchase and sales agreement with Sun Capital, Inc. ("Sun Capital"), whereby Sun Capital purchased the accounts receivable for the six customer accounts, not knowing that the accounts were fictitious. Holbrook, Sharp, and Throckmorton created fake invoices for the customer accounts and sent them to Sun Capital; Sun Capital then wired 80% of the invoice amount to Command Staffing and the "customers" were then to pay the entire invoice amount to Sun Capital. To keep the scheme going, Holbrook, Sharp, and Throckmorton created fake bank accounts in the names of the customers and made "Ponzi" payments to Sun Capital from the same funds that Sun Capital had wired to Command Staffing. This occurred for over 12 months. During that time, Command Staffing submitted false invoices totaling $10.9 million to Sun Capital, on which Sun Capital paid Command Staffing $8.8 million. Command Staffing returned $5.6 million to Sun Capital through Ponzi payments.

Eventually, the scheme was revealed, and Sun Capital attempted to place a lien on Command Staffing's stock, properties, and assets, which were offered as collateral in the master purchase and sales agreement. Sun Capital discovered, though, that an individual investor already had a lien against Command Staffing as collateral for a prior business loan. Sun Capital purchased the lien from the investor and then acquired all of the shares of Command Staffing and its subsidiary companies, including a software company known as Symbio Solutions, which was developing a web-based human resource application for use by hospitals.[1] After Sun Capital took possession of Symbio

---

[1] Before the district court, there was some dispute over whether the master purchase and sales agreement included Symbio Solutions as part of the collateral. The district court assumed without finding that Symbio Solutions was part of the collateral included in the agreement. That dispute is not continued on appeal, so we likewise assume without finding that Symbio Solutions was part of the collateral.

Solutions, a company which at the time was not producing a profit, it invested $10 million into the company hoping to turn an unprofitable company into a profitable one.

Holbrook was charged with and pleaded guilty to mail fraud and aiding and abetting thereof, in violation of 18 U.S.C. §§ 1341 and 2. In determining Holbrook's total offense level and Guideline range, the district court applied an eighteen-level enhancement based on the total loss attributed to the fraudulent scheme; the district court found a total loss of $3.2 million. U.S.S.G. § 2B1.1(b)(1)(J). Holbrook argued before the district court, and now argues on appeal, that this loss calculation insufficiently accounts for the collateral Command Staffing offered in the master purchase and sales agreement and which Sun Capital took possession of after it became aware of the scheme. U.S.S.G. § 2B1.1 cmt. n.(3)(E)(ii). The district court found that the collateral had little or no value and whatever little value it had would not have affected the Guideline range calculation.

We review the district court's application of the Guidelines de novo and factual determinations for clear error. United States v. Austin, 479 F.3d 363, 367 (5th Cir. 2007). "The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference." U.S.S.G. § 2b1.1 cmt. n.(3)(C).

Holbrook argues that the district court erred by miscalculating the value of the collateral obtained by Sun Capital, specifically the value of Symbio Solutions. "The Guidelines themselves do not address whether or how collateral is to be applied, but the commentary provides specific loss-calculation rules, including rules regarding collateral." Id. at 367. "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless

it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." Stinson v. United States, 508 U.S. 36, 38 (1993).

According to the Guidelines's commentary, the district court shall reduce the victim's loss by "the amount the victim has recovered at the time of sentencing from disposition of the collateral, or if the collateral has not been disposed of by that time, the fair market value of the collateral at the time of sentencing." U.S.S.G. § 2B1.1 cmt. n.(3)(E)(ii). Sun Capital did not dispose of the collateral, and Holbrook contends that the fair market value of Symbio Solutions at the time of sentencing was substantial. Ronald Caddell ("Caddell"), the new chief financial officer of Symbio Solutions, stated at sentencing that Sun Capital would not sell Symbio Solutions for less than the money it invested in it, $10 million. Had the district court applied a $10 million value to Symbio Solutions and used it to offset Sun Capital's loss, it would have resulted in a total loss value of zero, and a substantially lower Guideline range.

Holbrook does not contest the district court's factual finding that the value of Symbio Solutions at the time of sentencing was "either entirely or almost entirely the result of [Sun Capital]'s investment into the collateral." Essentially, the district court found that but for the victim's post-acquisition investment in Symbio Solutions, the company would have been worth nothing or almost nothing at the time of sentencing. There is substantial evidence in the record to support this finding. Symbio Solutions had no assets and the assets of other Command Staffing enterprises were valued at about $25,000 to $30,000 in computer equipment and furniture. Steven Camp, Sun Capital's legal counsel in many of the relevant transactions, testified at sentencing that at the time Sun Capital acquired the collateral, Symbio Solutions was in the process of developing software but was not generating any revenue. Further, he stated that the software Symbio Solutions did have was not patented, was for

demonstration purposes only, was not commercially viable, and had to be completely rewritten. Caddell said that although they expected Symbio Solutions to begin turning a profit within a year of the sentencing, the profitability potential was "because of the introduction of new products that [they were] building that [had] nothing to so with the initial product." Caddell went on to say that but for the injection of $10 million, Symbio Solutions would not have had anything.

Rather than contesting the district court's factual findings, Holbrook argues that a "literal" interpretation of the sentencing enhancement requires the district court to consider the fair market value of Symbio Solutions at the time of sentencing, regardless of whether its market value stemmed from Sun Capital's $10 million investment and introduction of new products. U.S.S.G. § 2B1.1 cmt. n.(3)(E)(ii). We do not agree with Holbrook's interpretation of the sentencing enhancement.[2] Sun Capital's investment into Symbio Solutions is not part of the collateral, even if it was later part of Symbio Solutions. Black's Law Dictionary defines collateral as, "Property that is pledged as security against a debt." Black's Law Dictionary 278 (8th ed. 2004). Clearly, Sun Capital's $10 million investment was not part of the property Command Staffing offered as security against the debt owed to Sun Capital.

The collateral, offered by Holbrook and acquired by Sun Capital, was Symbio Solutions as it was prior to Sun Capital's investment of financial and human capital)) that consisted of Symbio Solutions's incomplete, unworkable, and unpatented software. The district court found that the collateral was

[2] Even if Holbrook were right and his reading were a literal interpretation of the sentencing enhancement, we would not apply such a literal interpretation. We interpret the Sentencing Guidelines following the "ordinary rules of statutory construction." United States v. Carbajal, 290 F.3d 277, 283 (5th Cir. 2002). One rule is that we do not interpret the Sentencing Guidelines to produce absurd results. Austin, 479 F.3d at 368-69 (interpreting U.S.S.G. § 2B1.1 cmt. n.(3)(E) to avoid "arbitrary or absurd results"). Allowing money spent by the victim to offset the loss to the victim would certainly create an absurd result.

5

essentially worthless both at the time of acquisition and at the time of sentencing. It was only the value added to the collateral by Sun Capital that made Symbio Solutions worth a substantial amount. Therefore, the district court did not err by failing to consider the actual value of Symbio Solutions at the time of sentencing, because the actual value of Symbio Solutions did not represent the value of the collateral.

The district court's application of the U.S.S.G. § 2B1.1 was proper and the sentence imposed is AFFIRMED.