REVISED

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

November 23, 2009

Charles R. Fulbruge III
Clerk

No. 07-11151

UNITED STATES OF AMERICA,

Plaintiff-Appellee

v.

VERNON COOKS, JR.,

Defendant-Appellant

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM and STEWART, Circuit Judges, and ENGELHARDT, District Judge.[*]

CARL E. STEWART, Circuit Judge:

Vernon Cooks, Jr. ("Cooks") appeals his conviction and sentence for seven counts of wire fraud, one count of bank fraud, and six counts of money laundering. Finding no reversible error in his conviction and sentence, we affirm.

I.

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

Cooks was convicted of being the mastermind behind an ingenious but misguided scheme to cheat mortgage lenders by fraudulently obtaining house mortgage loans. In most of the accused transactions the documentary evidence and trial testimony show that Cooks followed the same basic pattern. For each transaction, Cooks first recruited an inexperienced real estate investor to serve as the nominal owner of the house, a so-called "straw purchaser." When Cooks found a house for sale, he then contracted with its owner to buy it. At the same time, Cooks entered into a contract to sell the same house to the straw purchaser for a much higher price. Cooks worked with one of two mortgage brokers, Abdul Karriem ("Karriem") and Deirdre Anderson ("Anderson"), to handle the mortgage loan process for each straw purchaser.

To obtain each loan for the higher price, Cooks and one of the mortgage brokers created a loan application for the straw purchasers that would persuade the lender of two things: one, that the house was worth substantially more than its real value; and two, that the straw purchaser qualified for the loan. To that end, Cooks and his broker cohorts forged and faked key documents for each application, or directed the straw purchasers to make false representations themselves. For each transaction, these documents included an appraisal (forged with the name and license number of a real licensed appraiser), a loan application that vastly overstated the straw purchaser's income and assets, and fake financial documents (tax returns, W-2's, rent verification forms, etc.). After the sales closed, the difference in sales price was left in a bank account controlled by Cooks. Cooks initially sent each straw purchaser checks to pay the mortgage, as promised. After a short period of time–generally less than six months –the payments from Cooks stopped, and the straw purchasers were then forced into foreclosure.

Cooks varied his methods in two transactions. In one case, there was no bona fide seller at all because Cooks already owned the house at the time of sale.

2

In most other respects, however, this transaction followed Cooks's pattern: a straw purchaser bought the home, with a loan fraudulently obtained by Cooks and his mortgage brokers. In another variation, Cooks contracted with a construction company to buy a house for $79,900. He then submitted a duplicate contract with a sales price of $125,000 to the mortgage lender. In support of the copycat contract, Cooks submitted a duplicate warranty deed and a HUD settlement statement listing the $125,000 price. Cooks pocketed the $45,100 difference, with the mortgage company receiving $4,300, more than half of which went to the mortgage broker Anderson.

Cooks was indicted on wire fraud, bank fraud, and money laundering charges. Karriem and Anderson were also indicted. Karriem pleaded guilty and testified for the Government. Following an initial mistrial, the district court held a three-week trial in 2007. Witnesses included the bona fide sellers, straw purchasers, representatives of the mortgage companies involved, and Karriem. Expert witnesses in appraisal and mortgage fraud also testified. The Government submitted the fraudulent appraisals, tax returns, rental verifications, loan applications, title documents, sales contracts, closing documents, and the checks and bank account records used to carry out the transactions. Cooks testified in his own defense.

The jury acquitted Anderson, but convicted Cooks on all charges. The district court sentenced Cooks to 135 months' imprisonment, nearly one and one half million dollars in restitution, and a five-year term of supervised release.

## II.

On appeal, Cooks raises six points of error which we address in turn.

## A.

Cooks first contends that the district court erred by admitting the expert testimony of a Government witness. Cooks argues that the expert, Agent Steve Overby ("Overby") of the Federal Deposit Insurance Company, was not qualified

to give expert testimony on the subject of mortgage fraud because he lacked sufficient experience.

This court reviews a trial court's decision to admit expert testimony under an abuse of discretion standard, subject to harmless error analysis. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999); General Elec. Co. v. Joiner, 522 U.S. 136, 141–43 (1997). Accordingly, we have recognized that district courts are given "wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge . . . will not be disturbed on appeal unless manifestly erroneous." Watkins v. Telsmith, Inc., 121 F.3d 984, 988 (5th Cir. 1997) (quoting Eiland v. Westinghouse Elec. Corp., 58 F.3d 176, 180 (5th Cir. 1995) (internal quotations omitted)).

In deciding whether the district court abused its discretion in qualifying Overby as an expert witness, we are guided by the Supreme Court's decision in Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), and Federal Rule of Evidence 702.

In Daubert, the Supreme Court instructed district courts to function as gatekeepers and permit only reliable and relevant expert testimony to be presented to the jury. See Daubert, 509 U.S. at 590–93. Before a district court may allow a witness to testify as an expert, it must be assured that the proffered witness is qualified to testify by virtue of his "knowledge, skill, experience, training, or education." FED. R. EVID. 702. A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject. See Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999).

If the witness is only testifying as a lay witness, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in

issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. FED. R. EVID. 701. "[T]he distinction between lay and expert witness testimony is that lay testimony results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." United States v. Yanez Sosa, 513 F.3d 194, 200 (5th Cir. 2008) (internal quotations omitted). As explained by the Second Circuit, "a lay opinion must be the product of reasoning processes familiar to the average person in everyday life." United States v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005). Moreover, any part of a witness's opinion that rests on scientific, technical, or specialized knowledge must be determined by reference to Rule 702, not Rule 701. FED. R. EVID. 701 advisory committee's note.

The Government argues that Overby's limited experience as a white collar fraud investigator and general certification as a fraud examiner qualifies him as an expert in any area of fraud. We are unconvinced by this argument. Prior to the instant case, Overby had sparse experience working on mortgage fraud cases and in fact had never been qualified as an expert in any case involving mortgage fraud. Unsurprisingly, he had no specialized training or classes in mortgage fraud and was seemingly unaware of basic statutes and literature which govern the field. Additionally, Overby had never taken any classes in appraising properties. Overby's lack of formal training and practical experience in mortgage fraud leads us to the conclusion that the district court abused its discretion when it qualified him as an expert.

While Overby should not have been qualified as an expert, our inquiry does not end there. An examination of Overby's disputed testimony reveals that much of it was merely descriptive and summarized the factual information and documents gathered throughout the investigation of Cooks and thus constituted permissible lay testimony. But, some of Overby's testimony, specifically his

opinion regarding the legality of Cooks's scheme, should not have been admitted by the district court because Overby's opinion required specialized "knowledge, skill, experience, training, or education" in mortgage fraud which he lacked. However, the error was harmless because there was other extensive evidence that the transactions were fraudulent and that Cooks was the major beneficiary. See United States v. Mendoza-Mendina, 346 F.3d 121, 127 (5th Cir. 2003) (under the harmless error doctrine, even if the district court abuses its discretion in admitting or excluding evidence, we will affirm "[u]nless there is a reasonable possibility that the improperly admitted evidence contributed to the conviction"); see also FED. R. CRIM. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded.").

## B.

The jury convicted Cooks on seven counts of money laundering, under 18 U.S.C. § 1957(a), a provision that prohibits knowingly engaging "in a monetary transaction in 'criminally derived property' of a value greater than $10,000 and . . . derived from specific unlawful activity." 18 U.S.C. § 1957(a). The statute defines "criminally derived property" as "any property constituting, or derived from, proceeds obtained from a criminal offense." 18 U.S.C. § 1957(f)(2). The jury instructions tracked this language, and additionally required that "the funds in question must already be proceeds obtained from a criminal offense when they were transferred by [Cooks]."

Cooks argues that the district court erred by failing to instruct the jury that the word "proceeds" means "profits," not gross receipts, as established in the Supreme Court's intervening decision in United States v. Santos, __ U.S. __, 128 S. Ct. 2020, 170 L. Ed. 2d 912 (2008). As Cooks failed to object on this basis at trial, review here is for plain error. United States v. Fernandez, 559 F.3d 303, 316 (5th Cir. 2009) ("We may review a claim raised for the first time on appeal,

6

even when based on an intervening Supreme Court decision, only for plain error.").

A four-justice plurality in Santos concluded that the term "proceeds" in the federal money laundering statutes means "profits" rather than "receipts." Santos, 128 S. Ct. at 2020. The defendants in Santos ran an illegal gambling business and paid employees' salaries from the business's gross receipts. Id. at 2023. The plurality reasoned that, without a "profits" definition of "proceeds," the defendant could be guilty of the additional offense of money laundering even though the transaction was a normal part of the underlying offense (e.g., illegal gambling). To hold otherwise would effectively merge the two offenses, resulting in a second conviction for the same crime. Id. at 2026–27. Defining "proceeds" as "profits," however, eliminates this problem. Id. at 2027.

Four justices dissented from this view. Id. at 2035–45 (Alito, J., dissenting). Justice Stevens concurred in the judgment, indicating that "proceeds" may have one meaning when referring to some specified unlawful activities and a different meaning when referring to others. Because Justice Stevens provided the decisive fifth vote for the plurality, and the ground of agreement between his opinion and the plurality's is uncertain, the precedential value of Santos in this case is unclear.

Notwithstanding the applicability vel non of Santos, the law of this circuit is settled. In United States v. Brown, 553 F.3d 768, 784–85 (5th Cir. 2008), this court held that in cases where the evidence indicates that the specified unlawful activity was profitable and the charged transactions incurred some modicum of profit, a failure to include a "profits" definition of proceeds in the jury instructions does not meet the plain error standard. Brown involved a group of pharmacists who sold hydrocodone under the guise of false prescriptions. Id. They were prosecuted for money laundering because they used the gains from these transactions to buy more drugs to further the scheme. Id. This court found

no clear and obvious error: "[N]ot even after Santos is the law 'clear' on what the prosecution must prove as 'proceeds' in this case; or, if profits must be proved, how this must be done under these circumstances." Id. Moreover, because the conspirators were "buying hydrocodone for considerably less than they were selling it for," it was clear that the unlawful activity was profitable and that the defendants' transactions involved profits from illicit sales. Id. at 784. Even if the law was clear, the evidence in Brown "demonstrated the requisite profits," such that there was "no likelihood of a grave miscarriage of justice." Id. (internal citations omitted). In such a case, this court held that omitting a "profits" definition from the jury instructions was "nowhere near" the plain error standard. Id. at 785.

Cooks's argument thus fails under the settled law of this circuit because he cannot show error that is clear and obvious. Even if we were to assume that the error was clear and obvious, Cooks's substantial rights were not affected. This case is indistinguishable from Brown in that the evidence here plainly demonstrates a profitable fraudulent scheme, and thus there is "no likelihood of a grave miscarriage of injustice" sufficient for reversible plain error. For each transaction, the evidence shows that Cooks received a check that represented the difference between the mortgage loan amount (based on an inflated value of the house) and the costs of closing the deal (the sale price of the home plus a commission to the mortgage broker). Because Cooks always sold the home to the straw purchaser for more than he bought it, the difference in selling price was pure profit, though Cooks did use an insignificant fraction of the money to make the straw purchasers' mortgage payments for a short period of time. Accordingly, the district court did not err when it failed to instruct the jury that the word "proceeds" means "profits," not gross receipts.

C.

The district court permitted the admission of evidence that Cooks engineered five fraudulent real estate deals that were substantially similar to those charged in the indictment. In admitting the evidence, the district court applied the two-pronged test set forth in United States v. Beechum, 582 F.2d 898, 911 (5th Cir. 1978) (en banc). The court held that the testimony was admissible as probative of Cooks's "intent, knowledge, motive, and plan" and determined that a limiting instruction would dispel any unfair prejudice.

We review a district court's admission of extrinsic acts evidence under Federal Rule of Evidence ("Rule") 404(b) for abuse of discretion, subject to a harmless error analysis. See, e.g., United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); see also FED. R. EVID. 103.

In evaluating the admission of extrinsic acts evidence under Rule 404(b), this court employs a two-step inquiry. First, the court must determine whether the extrinsic evidence is relevant to an issue other than the defendant's character, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Beechum, 582 F.2d at 911. Second, the probative value must not be substantially outweighed by the potential for undue prejudice. Id.

Four of the five uncharged transactions which were admitted into evidence were materially indistinguishable from the charged schemes. The fifth transaction involved a house implicated in an earlier fraudulent transaction. The transaction left Cooks liable for the loan, however, so Cooks sold the house to a straw purchaser for a highly inflated amount. We have held, and Cooks acknowledges, that extrinsic evidence of using the same scheme repeatedly is relevant to intent, knowledge, motive and plan in that it "demonstrate[s] how [an] operation work[s]." United States v. Nguyen, 504 F.3d 561, 574 (5th Cir. 2007). But Cooks argues that the evidence of his participation in the five real estate transactions should have been barred as irrelevant because there was

9

insufficient evidence to show that he tendered fraudulent documents in the uncharged transactions.

In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor. Huddleston v. United States, 485 U.S. 681, 689 (1988). "[T]]he government need only provide *some* evidence that the defendant committed the prior bad act." United States v. Crawley, 533 F.3d 349, 354 (5th Cir. 2008) (emphasis in original).

Here, Cooks's assertion that the Government had to prove that he tendered the fraudulent documents to the lenders in the uncharged transactions overstates the Government's burden. The Government did not have to show that Cooks personally submitted the documentation to the lender; it is sufficient to show that Cooks was knowingly involved in those deals. This is a showing that the Government clearly met. Cohort-turned-witness Karriem testified that Cooks was the mastermind of the overall scheme and that Cooks himself created many of the forged documents. Straw purchasers testified that Cooks or his associates induced them to buy the homes, in some cases directing them to make false representations to the lenders; in each case, he soon stopped making payments, causing the loans to default. Accordingly, we find that the extrinsic evidence was sufficiently established and relevant to the issue of Cooks's intent, knowledge, motive, and plan.

Although relevant, extrinsic acts evidence must nonetheless be excluded if its probative value is substantially outweighed by the danger of undue prejudice. Beechum, 582 F.2d at 911. Cooks has not demonstrated how the probative value of the evidence was substantially outweighed by the danger of undue prejudice to such a degree that for the district court to have admitted the evidence was an abuse of discretion. Certainly, the extrinsic evidence was probative as to the role Cooks played in the scheme and the modus operandi of

the scheme. Any undue prejudice to Cooks was greatly minimized by the court's detailed limiting instruction to the jury. The instruction identified the five additional transactions and prohibited the jury from considering the evidence "in deciding if defendant Cooks committed the acts charged in the indictment." See, e.g., United States v. Williams, 900 F.2d 823, 827 (5th Cir. 1990). ("As long as it is clear to the jury that the extrinsic evidence of the [other act] is presented only to show modus operandi to prove knowledge and intent, there is little danger that presentation of the extrinsic evidence will cause unfair prejudice . . . ."). Furthermore, even assuming that the district court erred when it admitted evidence of his involvement in the five fraudulent real estate transactions, Cooks has not demonstrated that it affected his substantial rights. We cannot conclude that the district court abused its discretion.

## D.

Cooks asserts that since he and his co-defendant Anderson were tried together and charged with aiding and abetting under 18 U.S.C. § 2, then Anderson's acquittal requires Cooks's as well. In essence, Cooks argues that he and Anderson were charged only with aiding and abetting one another.[1]

This court reviews for plain error, but regardless of the standard of review, Cooks's argument is foreclosed by Supreme Court and Fifth Circuit precedent. The Supreme Court stated in Standefer v. United States, 447 U.S. 10, 20 (1980), that, "[w]ith the enactment of [18 U.S.C. § 2], all participants in conduct violating a federal criminal statute are 'principals.' As such, they are punishable for their criminal conduct; the fate of the other participants is irrelevant." In United States v. McClatchy, 249 F.3d 348, 356 (5th Cir. 2001), we applied Standefer to arguments identical to Cooks's in holding that either defendant may

---

[1] The Government points out that this is inconsistent with the language of the indictment, which charges Cooks, Karriem, and Anderson as both principals and aiders and abetters. Either way, Cooks cannot support a valid claim here.

be punished as a principal under 18 U.S.C. § 2 no matter what happens to the other defendant.

E.

Cooks also contends that he was deprived of due process by the prosecutors' alleged failure to consult with the Justice Department's Asset Forfeiture and Money Laundering Section, as he claims they were required to do by Justice Department policy set forth in the United States Attorneys' Manual ("USAM"). Cooks first raised this claim in a motion for judgment of acquittal. The district court denied this motion without ruling on the merits because it had been filed nearly six months after the deadline for such a motion. If an issue is raised for the first time on an untimely motion before the district court and the district court does not consider it, the issue is not preserved on appeal. See First United Fin. Corp. v. Specialty Oil Co., Inc., 5 F.3d 944, 948 & n.9 (5th Cir. 1993); United States v. Chavez, 682 F.2d 1086, 1088 (5th Cir. 1982) ("It is well-established that the failure to timely and properly raise these contentions before the district court, either through objection, motion for mistrial, or other appropriate manner, precludes us from reviewing them unless they constitute plain error . . . ."). This court thus reviews for plain error.

Several sister circuits have held that the Department of Justice guidelines and policies do not create enforceable rights for criminal defendants. See, e.g., United States v. Fernandez, 231 F.3d 1240, 1246 (9th Cir. 2000) ("[I]t is clear that the USAM does not create any substantive or procedural rights."); United States v. Blackley, 167 F.3d 543, 548-49 (D.C. Cir. 1999) (same); United States v. Myers, 123 F.3d 350, 356 (6th Cir. 1997) (same); United States v. Piervinanzi, 23 F.3d 670, 682 (2d Cir. 1994) (same); United States v. Craveiro, 907 F.2d 260, 264 (1st Cir. 1990) (same). The USAM itself makes plain that it "provides only internal Department of Justice guidance [and] is not intended to, does not, and may not be relied upon[,] to create any rights." Fernandez, 231 F.3d at 1246

(quoting USAM 1-1.100). As for the specific money laundering guidelines at issue here, the Second Circuit has held that they do not provide any substantive rights to a criminal defendant. Piervinanzi, 23 F.3d at 682.

In any event, Cooks's claim that DOJ policy required consultation with the Asset Forfeiture and Money Laundering Section because this is a case of "receipts and deposits" has no merit. While it is true that the Manual requires consultation in a "receipt and deposits" case, this applies only where there is no concealment involved. In this case, Cooks used his name and his alias to appear as two different individuals, and wired the funds to a bank account in the name of Cooks's company, ASJ Remodeling. As a result, Cooks cannot show that the prosecutors failed to follow DOJ policy.

For either reason, the district court's refusal to grant an acquittal was not plain error.

### F.

Finally, Cooks makes four arguments related to the district court's application of the sentencing guidelines. This court reviews the district court's application of the guidelines de novo and factual findings for clear error. United States v. Crawley, 533 F.3d 349, 355–56 (5th Cir. 2008).

### 1. Loss Amount

Cooks first asserts that the district court erred in calculating the loss amount. "[A] court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence." United States v. Holbrook, 499 F.3d 466, 468 (5th Cir. 2007) (quoting United States v. Austin, 479 F.3d 363, 367 (5th Cir. 2007) and U.S.S.G. § 2B1.1, cmt. n.3(C)) (internal quotation marks omitted).

The district court found Cooks's crimes resulted in a loss of $1,429,237.58, an amount which corresponds to a 16-level upward adjustment for loss amounts between $1,000,000 and $2,500,000. U.S.S.G. § 2B1.1(b)(J). Cooks argues that

this amount is incorrect because it is based on irrelevant uncharged conduct. His proposed loss calculation would have resulted in a 14-level adjustment, reducing his total offense level by two.

After hearing testimony concerning the uncharged transactions, the district court judge found by a preponderance of the evidence that they were relevant conduct and that the resulting losses were properly included in the loss amount. Uncharged conduct is "relevant conduct" and thus may be used in determining loss amount if it is part of the "same course of conduct" or "a common scheme or plan" as the offense of conviction. U.S.S.G. § 1B1.3, cmt. n.9. There is ample evidence that the uncharged transactions qualify as relevant conduct: they were the same type of mortgage fraud as those charged in the indictment and they include several common factors and people (straw purchasers, fake appraisals that generally used the same stolen credentials, fake rental verifications, and fake tax returns). In all cases, Cooks walked away with the extra cash from the deal, with the lender taking the loss. Thus, Cooks cannot demonstrate that the objected-to transactions are not properly considered "relevant conduct," and his "loss amount" claim must fail.[2]

2. Leader/Organizer Enhancement

Cooks asserts that the district court clearly erred in applying a four-level enhancement for being a leader or organizer of criminal activity. U.S.S.G. § 3B1.1(a). This claim lacks merit. The straw purchasers testified that Cooks and his associates found the houses and obtained the loans, with minimal assistance; Karriem testified that Cooks played the leading role in the scheme and in producing the forged documents; and financial records demonstrate that Cooks received the overwhelming bulk of the profit generated.

---

[2] Similarly, Cooks's claim that the district court erred in applying an enhancement for ten or more victims also relies on the argument that the uncharged transactions were not relevant conduct, and thus fails for the same reason.

3. Identity Theft Enhancement

The guidelines provide for a two-level enhancement if the offense involved "the unauthorized . . . use of another's means of identification unlawfully to produce or obtain any other means of identification." U.S.S.G. § 2B1.1(b)(10)(C)(I). A "means of identification" is defined as "any name or number that may be used alone or in conjunction with any other information, to identify a specific individual." U.S.S.G. § 2B1.1, cmt. n.9(C)(ii)(I); United States v. Radziszewski, 474 F.3d 480, 487–88 (7th Cir. 2007). Here, the district court found that Cooks used, without authorization, the name and appraisal license number of a certified appraiser to create fraudulent appraisals with which he obtained mortgage loans. It then found that the loan numbers of the mortgages Cooks obtained through the fake appraisals qualified as "means of identification" within the meaning of the guidelines, and that Cooks thus qualified for the two-level "identity theft" enhancement.

Cooks contends that the district court erred in applying the enhancement on the ground that the mortgage loan number is not a "means of identification." We are unconvinced by his argument. A mortgage loan number is similar to a bank account number, which is specifically recognized in the guidelines as a "means of identification" that can be used to identify a specific individual. U.S.S.G. § 2B1.1, cmt. n.9(C)(ii)(I); Radziszewski, 474 F.3d at 487–88; 18 U.S.C. § 1028(d)(7). In fact, each mortgage loan number, like a bank account number, is presumably unique, and thus traceable to the mortgagor. Accordingly, the district court did not err in applying the enhancement.

4. Procedural and Substantive Reasonableness

Cooks argues that the district court failed to take the 18 U.S.C. § 3553(a) sentencing factors into account. Even a cursory review of the record reveals this to be untrue. The court explicitly considered the factors, heard testimony from defense witnesses, and discussed their application to Cooks's case at length with

counsel. To the extent Cooks's argument is one of procedural unreasonableness, it fails.

As for substantive reasonableness, Cooks's argument is similarly unavailing. This court applies a rebuttable presumption of reasonableness to a properly calculated, within-guidelines sentence such as Cooks's. United States v. Candia, 454 F.3d 468, 473 (5th Cir. 2006). When reviewing a sentence for reasonableness, the court "will infer that the judge has considered all the factors for a fair sentence set forth in the Guidelines." United States v. Mares, 402 F.3d 511, 519–20 (5th Cir. 2005). The presumption is rebutted only upon a showing that the sentence does not account for a factor that should receive significant weight, it gives significant weight to an irrelevant or improper factor, or it represents a clear error of judgment in balancing sentencing factors. United States v. Nikonova, 480 F.3d 371, 376 (5th Cir. 2007).

Cooks contends that his sentence creates an unfair disparity with the much shorter sentence of co-defendant Karriem. Cooks and Karriem, however, are not similarly situated, and are not appropriate points for comparison in a reasonableness analysis. Karriem pled guilty to one count, while Cooks was convicted of fourteen. Karriem received a downward departure for substantial assistance, and Cooks had a much more significant role in the scheme, reflected in the larger profits he received.

Cooks's reliance on the fact that other white collar defendants have received shorter sentences despite far greater loss amounts is unavailing. Cooks's sentence was based not only on loss amount, but also on his eligibility for a number of other aggravating factors, including his leadership role, the number of victims, and identity theft. Cooks fails to show any unwarranted disparity sufficient to overcome the presumption that his within-guidelines sentence was unreasonable.

III.

For the foregoing reasons, Cooks's conviction and sentence are affirmed.